**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

—————————————————————————
                                 )

**DANIELLE N. SAARI,**          )
                                 )          **CIVIL ACTION**
               **Plaintiff,**     )          **NO.  4:19-40112-TSH**
                                 )

                **v.**                    )

**ALLEGRO MICROSYSTEMS, LLC, and**   )
**JAMES MOORE,**              )
                                 )
              **Defendants.**    )
————————————————————————— )

**ORDER AND MEMORANDUM ON DEFENDANTS' MOTION FOR SUMMARY**
**JUDGMENT (Docket No. 41) and PLAINTIFF'S MOTION TO AMEND (Docket No. 47)**

**March 14, 2022**

**HILLMAN, D.J.**

Plaintiff Danielle Saari commenced this action against defendants Allegro MicroSystems,

LLC ("Allegro") and James Moore for hostile work environment and retaliation claims under

federal and state law.  The defendants move for summary judgment.  (Docket No. 41).  Saari cross-

moves to amend her complaint.  (Docket No. 47).  For the following reasons, the Court ***grants*** the

defendants' motion for summary judgment and ***denies*** Saari's motion to amend.

**Background**

Allegro hired Saari as a cost accountant in May 2014.  She reported to Mike Curtis, the

manager of Allegro's cost accounting group.  Moore, the company's Director of Finance, Global

Operations, oversaw the cost accounting group, among others.  In 2015, Saari began regularly

meeting one-on-one with Moore.  She respected Moore and felt that he cared about her

development.

Moore was "very aggressive" with Curtis and would occasionally yell at Curtis during meetings.  It was "very clear" to Saari that Curtis was afraid of Moore.  At times, Moore would also raise his voice and swear at other members of the cost accounting group.

Moore testified that his relationship with Saari was "friendly" and "outgoing;" to him, "[t]hat's all it was."  Saari paints a different picture.  Saari testified that Moore would frequently comment on her clothes, shoes, and accessories, and touch her on her back, shoulders, and arms. He once touched the lapel of her trench coat and said, "I really like this on you."  Another time, he tugged on her braided hair and told her how much he liked it.  He later told her that she should keep her hair curly, mentioning that he finds curly hair attractive.

In late 2015, Saari learned that there was a rumor going around the office that she and Moore were having an affair.  Saari and Moore were not having an affair, but years earlier, Moore had had an affair with another accountant at Allegro.  In a meeting in which Moore addressed the rumors and prior affair with the cost accounting group, Moore stated that Saari and the woman with whom he had had an affair looked alike.

In 2016, before Saari went on maternity leave, Moore was "very supportive" about her eventual return to work.  While she was on leave, Moore texted her to say that he was thinking about her "way too much."  In general, Saari texted with Moore "quite a bit," often referring to him as her "work dad."  When Saari returned from maternity leave, she did so in a part-time capacity, and Moore pushed her to work at her previous pace.  Working part time, however, she struggled to keep up with her workload.[1]  A handful of times, she noticed Moore staring at her breasts.

---

[1] Nonetheless, in her annual performance review, completed sometime after March 2017, Curtis gave Saari a "successful" rating, writing that "there has been some initial struggles when

At the end of 2016, Saari felt that her relationship with Moore became "hot and cold."  One week, Moore would tell her that he supports her and cares about her.  The next week, he would yell at her, swear at her, and call her an embarrassment.  Once, in 2017, when she and Moore went out for coffee, Moore told her that she was intelligent, and that he found intelligence sexy.[2]

In May 2017, Saari invited Moore to lunch to try "to get things peaceful again."  On their way to lunch, Moore mentioned how excited he was to have lunch with "his favorite."  During their meetings that spring, Moore made open-ended comments about how Saari was "so smart, but . . . just not getting it."  Saari later came to believe these comments were implying that Moore wanted her to have an affair with him.  One day, Saari mentioned to Moore that she was five foot, five inches tall.  Moore said he did not believe her and pulled her into his body; he held her against his chest for three to five seconds until she pushed him away.  Moore then had Saari stand against the wall to measure her height.

In October 2017, Moore encouraged Saari to apply for a position with greater responsibility that would report to him.  Saari decided not to apply because she was starting to "put everything together;" she came to believe that Moore was taking advantage of his position of power over her.

In early 2018, Curtis left his role as manager of the cost accounting group and was replaced by Jean Horrigan.  Horrigan thought Saari was underperforming, and Saari felt that Horrigan was nit-picking her and "treating [her] like [she] was a child."  On Thursday, March 15, 2018, Saari went to Bill Looney, Allegro's Director of Human Resources, to discuss concerns she had about Horrigan's management style.  Looney asked Saari if Moore was aware of the problems she was

---

she returned from maternity leave, but in the past several months, I can see the concentration and confidence growing."

[2] A few days later, Saari emailed Moore to thank him for the talk and to let him know that she would like to meet again soon.

having with Horrigan.  Saari responded that Moore had said some things that had made her feel uncomfortable, but that she did not want to talk about Moore.  On Friday, March 16, 2018, Saari was out sick.  Moore, apparently hearing that Saari was out sick, emailed her that day to tell her he was thinking of her.

On Monday, March 19, 2018, Saari met with Looney again and told him that she wanted to file a formal harassment complaint against Moore.  Looney discussed this with Sean Burke, Allegro's Chief Human Resources Officer, the same day.  Moore was out on vacation the week of March 19, 2018.  On Tuesday, March 20, 2018, Burke met with Paul Walsh, Allegro's Chief Financial Officer (and Moore's boss), and Richard Kneeland, Allegro's General Counsel, to discuss investigating Saari's complaint.  They decided to retain an outside investigator.  That afternoon, they hired Keith Minoff, an employment lawyer with experience in workplace investigations.

Minoff met with Saari on March 22, 2018.  Saari reported over a dozen incidents of "flirty behavior" from Moore, starting in the middle of 2015 and continuing, on and off, through the summer of 2017.  Her allegations included Moore making inappropriate comments about her outfits and hair; inappropriate touching, such as of her hair and shoulders, and inappropriate text messages, such as saying, "you are too sweet.  I hope you're getting a great sleep."  She also reported several instances of "bullying," which included Moore yelling at her about her work performance in front of others.

Moore returned from vacation on Monday, March 26, 2018.  Moore was working in Allegro's Manchester office that day.[3]  Shortly after 11 A.M., Saari emailed Moore, copying Horrigan, to ask whether she should "expect Q3 E&O terminations this week."  Moore responded

---

[3] Saari was based out of Allegro's Worcester office.

4

within ten minutes, removing Horrigan from the email, asking Saari how she was doing, whether she was in Worcester that day, and if he could call her later to give her an update because he was on a call. Saari responded thirty minutes later, saying she was doing better and asking Moore how his vacation was. Moore met with Minoff that afternoon, at which point he was informed of Saari's allegations. The company requested that he continue to work in the Manchester office and not have any further contact with Saari.

Moore denied many, but admitted some, of the allegations raised by Saari to Minoff. Minoff also met with Curtis, Horrigan, and another cost accountant, Karen Hendrie; none of them had witnessed Moore engaging in sexually inappropriate behavior with Saari. Horrigan reportedly told Minoff that Saari's work performance had declined over the years and "always runs for the easy excuse when things get tough." Hendrie also told Minoff that Saari was having performance issues.

Minoff issued a written report to Allegro on April 10, 2018. The report concluded, as to sexual harassment:

> [Moore's] conduct may not meet all of the legal criteria for sexual harassment based on hostile work environment, but it is a close call. In order to be actionable, such conduct has to be "severe or pervasive." While I find that none of [Moore's] conduct could be fairly characterized as "severe," it could be considered "pervasive" given the relatively large number of episodes occurring over a long period of time, albeit with time gaps[.]

> Whether or not [Moore's] conduct qualified as sexual harassment, it was clearly inappropriate and unprofessional, especially given the power that [Moore] has over [Saari] as her ultimate boss.

On April 11, 2018, Burke met with Saari to discuss Minoff's findings and the company's actions taken regarding Moore. Burke informed Saari that Minoff had determined that Moore's behavior was inappropriate. He also told Saari that Moore would no longer be working in the cost accounting group, would no longer have anyone reporting to him, and would be working out of

the Manchester office.  Indeed, that April, Moore transferred to the Manchester office and was stripped of his managerial responsibilities.  Saari was also offered a severance package, which she did not take.  Walsh told Curtis, Horrigan, and Hendrie that the results of the investigation were inconclusive, or that Saari's sexual harassment complaint was "not found valid."

Saari saw Moore in the Worcester office twice after he was transferred to the Manchester office, but they did not interact.  In May 2018, Moore emailed Allegro's CEO denying Saari's allegations and outlining why he believed Saari was an incompetent employee.  Sometime around when the investigation concluded (the parties dispute whether it was before or after), Horrigan began asking an HR representative to sit in on her one-on-one meetings with Saari.  Saari's annual performance review, completed by Horrigan sometime after March 31, 2018, was her first negative performance review at Allegro; she received a "development needed" rating.  However, Horrigan also wrote in the review, "We firmly believe if [Saari] focuses and applies herself she will be successful and will be able to take on additional duties."

Saari resigned on July 6, 2018.  She filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the federal Equal Employment Opportunity Commission ("EEOC") on January 11, 2019.  This suit followed.

Saari initially asserted thirteen claims against Allegro and Moore stemming from these incidents.  The Court dismissed several claims, including federal and state retaliation claims against Allegro, following the defendants' motion to dismiss.  *See* Docket No. 18.  The defendants move for summary judgment on the remaining claims.  In addition to opposing summary judgment

on some of the remaining claims,[4] Saari moves to amend her complaint to revive her federal and state retaliation claims against Allegro.  The Court will address each motion in turn.

<u>Discussion</u>

*1.  Motion for Summary Judgment*

*a.  Legal Standard*

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party.  *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994).  A fact is "material" when it may affect the outcome of the suit.  *Id.*  When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

*b.  Hostile Work Environment Claims*

Saari brings three hostile work environment claims against the defendants.  She alleges that Allegro, in violation of Title VII, 42 U.S.C. § 2000e-2, subjected her to "a sexually hostile work environment in which unwanted and unwelcome sexual conduct was so severe and pervasive that a reasonable person would consider it intimidating, hostile, and/or abusive." (Count I).  She further alleges that Moore, in violation of M. G. L. c. 151B, sexually harassed her.  (Count IX).  She finally alleges that Allegro, under M. G. L. c. 151B, is vicariously liable for Moore's harassment. (Count IV).

---

[4] Saari does not oppose summary judgment as to her unlawful interference claims (Counts VII and XII) or tortious interference claim (Count XIII).  For the reasons stated in the defendants' motion, summary judgment as to those claims is granted.

The defendants argue that these claims are time barred. "In order to prosecute a harassment claim under either Massachusetts or federal law, an aggrieved party must first file a timely administrative complaint." *Noviello v. City of Boston*, 398 F.3d 76, 85 (1st Cir. 2005). As relevant here, Saari had 300 days from the alleged violation to file her administrative complaint. *See* 42 U.S.C. § 2000e-5(e)(1); M. G. L. c. 151B § 5. It is undisputed that Saari instituted proceedings with the MCAD and EEOC on January 11, 2019.

Hostile work environment claims, by their very nature, involve repeat conduct. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002). Accordingly, such claims are timely "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [statutory] time period." *Id.* at 122. A timely "anchoring act" need not on its own be actionable, but it must "contribute" to the impermissibly harassing environment. *See Nieves-Borges v. El Conquistador Partnership, L.P., S.E.*, 936 F.3d 1, 9 (1st Cir. 2019). To contribute to the impermissibly harassing environment, the anchoring act must bear a "substantial relationship" to the prior acts of abuse. *See Diaz v. Jiten Hotel Mgmt., Inc.*, 671 F.3d 78, 85 (1st Cir. 2012); *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 474 n.7 (1st Cir. 2010).

Because Saari commenced proceedings on January 11, 2019, the statutory limitations period extends back to March 17, 2018. Thus, Saari can survive summary judgment if a jury reasonably could find any of the defendants' acts after March 17, 2018 to have contributed to the alleged harassing environment. *See Nieves-Borges*, 936 F.3d at 9.

The bulk of alleged harassment occurred from 2015 to 2017. During that period, Moore frequently commented on Saari's appearance and clothes, inappropriately touched her, and bullied her about her work performance. At her deposition, Saari initially testified that Moore's harassing

8

behavior ended in 2017. She later clarified that Moore continued to make inappropriate comments and inappropriately touch her up until their last meeting in March 2018. It is undisputed, however, that Saari and Moore last met before March 17, 2018.

In opposition to the defendants' motion for summary judgment, Saari contends that several actions taken by Moore after March 17, 2018 contributed to the harassing environment. First, she points to the email Moore sent her on the morning of March 26, 2018, in which Moore asked her how she was doing, whether she was in Worcester, and whether he could call her later that day. In an affidavit attached to her opposition, Saari avers that she felt intimidated by the email. She argues that a jury reasonably could find that the email was invasive, intimidating, or demeaning, such that it contributed to the alleged harassing environment. Moore's email, however, was in response to Saari's own email asking for an update on a work-related timeline. Even if Moore knew about the allegations against him prior to sending the email, and even if Saari felt intimidated by the email, no reasonable jury could conclude that the email contributed to the harassing environment otherwise alleged. The email is neither sexual nor bullying in nature.

Second, Saari points to comments Moore made to Minoff and Allegro's CEO denying the allegations against him and criticizing Saari's work performance. Moore's denials of Saari's allegations are entirely unrelated to the conduct that created the alleged hostile environment; that is, they are unlike the alleged sexual comments, inappropriate touching, and bullying. Moore's criticism of Saari's work performance, moreover, is unlike the alleged bullying. While both concerned Saari's work performance, Moore's post-March 2018 comments were not directed at Saari, and there is no indication that Saari even knew about the comments prior to this litigation. Furthermore, there is no indication that Moore's post-March 2018 criticism had any effect on Saari's work environment. Minoff found Moore's credibility questionable, and Allegro stripped

Moore of his managerial responsibilities thereafter. Accordingly, no reasonable jury could conclude that such criticism contributed to the alleged harassing environment.

Finally, Saari points to acts of others after March 17, 2018. For example, she asserts that Horrigan and Hendrie lied to Minoff by describing her as "all about the money" and "litigious." Saari also suggests that Walsh misinformed her colleagues in the cost accounting group about the results of Minoff's investigation by telling them that Saari's complaint was "not found valid," and that the results of the investigation were "inconclusive." Saari also asserts that Allegro executives told her that her allegations were not substantiated and found to be a "he said/she said," and then offered her a severance package. Finally, Saari contends that she was given her first negative performance review after reporting her complaint. Setting aside whether these acts could constitute retaliation, they do not substantially relate to the hostile work environment otherwise alleged. Not only are these acts not from Moore, but they are also neither sexual nor bullying in nature. Thus, they cannot reasonably be said to anchor Saari's hostile work environment claims within the limitations period.

Because the asserted acts reasonably contributing to the alleged hostile work environment occurred prior to March 17, 2018, summary judgment on Saari's hostile work environment claims (Counts I, IV, and IX) is warranted.

### c. Retaliation Claim against Moore

Saari alleges that Moore retaliated against her in violation of M. G. L. c. 151B. (Count X). To prevail at trial, Saari must prove (1) that she engaged in protected conduct, (2) that she suffered some adverse action, and (3) that a causal connection existed between the protected conduct and adverse action. *See Mole v. Univ. of Mass.*, 814 N.E.2d 329, 339-40 (Mass. 2004). An adverse action is one that is "substantial enough to have materially disadvantaged an employee, such that

objective aspects of the employee's work environment are affected." *See Yee v. Massachusetts State Police*, 121 N.E.3d 155, 162 (Mass. 2019). The defendants contend that there is insufficient evidence to support Saari's retaliation claim against Moore.

Saari engaged in protected conduct when she raised concerns about Moore to Allegro HR on March 15, 2018. Saari appears to argue that Moore retaliated by telling Minoff and Allegro's CEO that she was an incompetent employee. As mentioned, however there is no indication in the record that Moore's comments materially disadvantaged Saari, such that the objective aspects of Saari's work environment were affected. After Moore spoke with Minoff and Minoff issued his findings to Allegro, Moore was stripped of all managerial responsibilities and told to work out of Allegro's Manchester office. By the time Moore emailed Allegro's CEO, moreover, Moore was not involved with Saari's work. While Saari received her first negative performance review in June 2018, the review was attributable to her direct supervisor, Horrigan, not Moore. Furthermore, in deciding the defendants' motion to dismiss, the Court already rejected the argument that the negative review itself constituted an adverse employment action. *See* Docket No. 18 at 9. Thus, because no reasonable jury could conclude that Moore's alleged retaliatory acts adversely affected Saari's work environment, summary judgment on Saari's retaliation claim against Moore (Count X) is warranted.

### 2. Motion to Amend

The Court dismissed Saari's federal and state retaliation claims against Allegro in February 2020 because Saari had not alleged in her complaint any adverse employment action taken by Allegro that was reasonably tied to her act of filing a sexual harassment complaint. *See* Docket No. at 8. The Court dismissed the claims without prejudice, however, and with leave to amend.

*See id.*  Thereafter, the Court issued a scheduling order setting a deadline for amendments to pleadings, except for good cause shown, for March 24, 2020.  *See* Docket No. 19.

In August 2021, well after the March 2020 deadline, and shortly after the defendants moved for summary judgment, Saari moved to amend her complaint to add factual support for her retaliation claims against Allegro.  Saari asserts that newly discovered evidence supports these claims.  Specifically, she contends that she learned through deposition testimony (1) that Allegro falsely told her colleagues that her allegations were found not valid, (2) that Horrigan asked an HR representative to sit in on their one-on-one meetings to be a "witness" so that "nothing could be misinterpreted," and (3) the extent to which Horrigan and Hendrie tried to discredit her in interviews with Minoff.

### a. Legal Standard

Where a plaintiff waits to file a motion to amend her complaint until after the defendant has moved for summary judgment, the plaintiff is required to demonstrate that the proposed amendments are supported by "substantial and convincing evidence."  *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994).  The plaintiff must also show "some valid reason for [her] neglect and delay.  *See Mass. Eye & Ear Infirmary v. GLT Phototherapeutics, Inc.,* 412 F.3d 215, 231 (1st Cir. 2005) (quoting *Acosta-Mestre v. Hilton Int'l of Puerto Rico*, 156 F.3d 49, 53-53 (1st Cir. 1998)).  A district court enjoys significant latitude in deciding whether to grant leave to amend.  *See ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 55 (1st Cir. 2008).  Grounds for denial include futility of amendment and undue delay.  *See id.*

### b. Futility

The defendants argue that Saari's amendment would be futile.  To prevail on a claim for retaliation under either Title VII or M. G. L. c. 151B, a plaintiff must prove (1) that she undertook

protected conduct, (2) that she suffered an adverse employment action, and (3) that the two were causally linked.  *See Nieves-Borges*, 936 F.3d at 10.  An adverse employment action under Title VII is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Perez-Cordero v. Wal-Mart Puerto Rico, Inc.*, 656 F.3d 19, 31 (1st Cir. 2011) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  An adverse employment action under M. G. L. c. 151B is one that is "substantial enough to have materially disadvantaged an employee, such that objective aspects of the employee's work environment are affected.  *See Yee*, 121 N.E.3d at 162.  "[A] criticism that carries with it no consequences is not materially adverse and therefore not actionable."  *Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 73 (1st Cir. 2011).

In support of her motion, Saari alleges that Allegro falsely told her colleagues that her allegations were not found valid.  To be sure, Horrigan testified that Walsh told her that "the sexual harassment complaint was not found valid," which Horrigan took to mean that there was no proof of sexual harassment.  Walsh, however, testified that he told Horrigan that the report from the independent investigator was "inconclusive" as to sexual harassment.  Curtis likewise testified that Walsh told him and others that the results of the investigation were inconclusive, or something "along those lines."  The report, while describing the case as a close call and outlining numerous instances of inappropriate behavior, did not provide a definitive opinion on sexual harassment.  Thus, it is far from clear whether Walsh indeed misrepresented the findings, as Saari asserts.  In any event, a company issuing a denial about sexual harassment allegations, even if exaggerating a report's conclusions in its favor, does not, without more, constitute an adverse employment action.  Indeed, here, in discussing the report with Saari's colleagues, Allegro made clear that the report

indicated that Moore should no longer have people working for him. Allegro then stripped Moore of his managerial responsibilities, of which Plaintiff's colleagues necessarily were aware.

Saari also alleges that Horrigan asked an HR representative to sit in on their one-on-one meetings to, in Horrigan's words, be a "witness" so that "nothing could be misinterpreted." The defendants contend that Horrigan wanted HR present because Horrigan was a new manager hoping to address what she considered to be Saari's poor work performance. Horrigan's deposition testimony reasonably supports either conclusion; thus, the testimony is far from substantial or convincing. Even accepting Saari's inference, however, Saari has not explained how the presence of HR in her one-on-one meetings with Horrigan constituted an adverse employment action.

Saari further alleges that Horrigan and Hendrie tried to discredit her in interviews with Minoff. There is no indication, however, that Horrigan or Hendrie's statements to the investigator affected Plaintiff's employment in any way. Indeed, the investigator found Saari's complaint and allegations credible, despite Horrigan and Hendrie's comments. Thus, the amendment would be futile.

### c. Delay

The defendants also argue that Saari unduly delayed in seeking leave to amend. The defendants contend that two of the three allegations Saari raises to support her amendment are not new. The Court agrees. With respect to the one-on-one meetings with Horrigan and HR, Saari alleged in her complaint that, "After refusing to resign, [Saari] was, for the first time, required to attend weekly performance reviews with her manager Jean Horrigan with an HR representative present." The Court dismissed the retaliation claim against Allegro with that allegation already in the complaint. Moreover, with respect to Hendrie and Horrigan's allegedly disparaging comments to Minoff, the defendants assert that they produced the report to Saari in February 2021, and that

the report outlined several of Hendrie and Horrigan's comments.  Yet Saari waited until August 2021, after the defendants had moved for summary judgment, to move to amend the complaint. Saari's explanation for her late amendment is unconvincing -- her delay constitutes additional reason to deny her motion.

### Conclusion

For the reasons stated, the defendants' motion for summary judgment is ***granted***, and the plaintiff's motion to amend is ***denied***.


**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**